[No. D002890. Fourth Dist., Div. One. May 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD NEIL CALLAHAN, Defendant and Appellant.

Counsel

James M. Gattey and Stephen W. Parrish for Defendant and Appellant.

Edwin L. Miller, Jr., District Attorney, Brian E. Michaels and Gloria L. Michaels, Deputy District Attorneys, for Plaintiff and Respondent.

## Opinion

**BROWN (Gerald), P. J.**—A California highway patrolman arrested Gerald Callahan for interfering with the performance of his duty (Pen. Code, § 148), the sole charged offense. A jury found Callahan not guilty of violating section 148, but guilty of uttering offensive words in public which were inherently likely to provoke an immediate violent reaction (Pen. Code, § 415, subd. (3)), a lesser related offense (see *People* v. *Geiger* (1984) 35 Cal.3d 510, 521, 525, 526, 527, 531-532 [199 Cal.Rptr. 45, 674 P.2d 1303]). Callahan's appeal to the appellate department of the superior court went for naught. We ordered transfer to this court (Cal. Rules of Court, rule 62(a)).

The record leaves much to be desired. ■ A party in a criminal case is entitled to a sufficient record to provide him a meaningful appeal. (See *March* v. *Municipal Court* (1972) 7 Cal.3d 422, 428 [102 Cal.Rptr. 597, 498 P.2d 437, 66 A.L.R.3d 945].) We do not have a reporter's or verbatim transcript of the trial. Each party tendered a proposed settled statement of facts. Our Supreme Court says, "Sometimes a statement of the facts agreed to by both sides will be sufficient, . . ." (*March* v. *Municipal Court, supra,* 7 Cal.3d 422, 428.) Here the trial court accepted the factual statement ten-

dered by the People and rejected Callahan's tender.[1] Incomplete though it may be, we look only to the accepted statement of facts. ■ As a matter of law the facts do not support the conviction.[2] We reverse.

## I

Soon after midnight Highway Patrolman George received a message to investigate a traffic collision in Solana Beach. He found a truck had struck two parked cars. The truck driver was seated in a lawn chair being attended by several persons, including Callahan's wife. George thought the driver had a superficial scratch on his forehead. The driver stubbornly refused going to the hospital. George returned to the collision site, anxious to clear the area to eliminate a traffic hazard for persons about to be leaving nearby bars.

When George returned to the truck driver for his statement, Callahan announced he was a doctor, he had examined the driver and thought he required medical attention. Callahan appeared to be intoxicated. George told Callahan the driver had declined medical attention. When Callahan argued with George, the officer again asked the driver if he wanted medical attention. After Callahan's wife and another person said "Yes," the driver agreed. George radioed for an ambulance and returned to the collision scene.

While George gathered statements from witnesses, Callahan interrupted and inquired about the ambulance. George said one was on the way. Callahan responded, "Oh bull-shit! Don't give me that fucking shit." George warned Callahan not to interfere and turned away to complete his investigation. Callahan followed him, yelling and uttering profanities, interrupting him as he spoke to witnesses, stepping in front of him several times yelling for the ambulance. At least twice he was so close to the officer that he spat[3] in his face as he argued for medical attention.

Three times George warned Callahan to stop interfering or he would arrest him for delaying a police officer in violation of Penal Code section 148. After the third warning, when Callahan called the officer a "fucking asshole,"[4] the officer arrested him.

---

[1]Callahan's proposed settled statement gives a more extensive uncontested background of the event, pointing out, e.g., it occurred in the street in front of his home. He himself was not a motorist at that time. Without this information, one might have the impression Callahan was a traveler on the highway.

[2]Had Callahan been convicted of interfering (Pen. Code, § 148), we would affirm.

[3]In their briefs, both sides say "spittle struck the officer's face."

[4]To avoid continuous repetition of the phrase which arguably would assist its passage into parlor parlance, we refer to it as the "Callahan epithet."

The entire confrontation lasted between 10 and 20 minutes. There was no direct physical contact between Callahan and George. The officer testified Callahan's language did not provoke a violent reaction.

## II

This nation prides itself as unsurpassed in upholding the freedom of its people to express themselves as they see fit without fear, subject only to certain reasonable conditions prescribed by law.

A land as diverse as ours must expect and tolerate an infinite variety of expression. What is vulgar to one may be lyric to another (*Cohen* v. *California* (1971) 403 U.S. 15, 25 [29 L.Ed.2d 284, 293-294, 91 S.Ct. 1780]). Some people spew four-letter words as their common speech such as to devalue its currency; their repetition dulls the senses; Billingsgate thus becomes commonplace. Not everyone can be a Daniel Webster, a William Jennings Bryan or a Joseph A. Ball.

Some writers exalt sex and earthy words to sell their books. Not everyone is a Louis L'Amour, whose hero swears if at all under his breath and whose heroine's suggestiveness, at most, is to walk away, her shoulders prim, her hips less so.

In 1972 this court considered *In re Rowena V.* (4 Crim. 5237).[5] Rowena, traveling south on Interstate 5, shouted, "You ask me if I give a fuck" to some boys in the next lane. Mrs. Reitsma, a stranger, overheard the phrase and became upset. Reitsma followed Rowena, caused a security officer to stop her, and in the officer's presence, Reitsma, wrought with righteous rectitude, wrathfully requested Rowena to repeat the rude and revolting remark. Rowena readily responded with a reprise. Reitsma filed a citizen's complaint against Rowena. Rowena was convicted of disturbing the peace (Pen. Code, § 415),[6] and was imprisoned. We granted habeas corpus, pointing out the dual communicative function of words, emotive as well as cognitive (*Cohen* v. *California, supra,* 403 U.S. 15, 26 [29 L.Ed.2d 284, 294]). We construed Rowena's remark as being in effect, "You ask me if I give a damn."

---

[5] An unpublished opinion to which we may refer (*People* v. *Castro* (1985) 38 Cal.3d 301, 323 [211 Cal.Rptr. 719, 696 P.2d 111]).

[6] Penal Code section 415, differently worded in 1972 compared to the section today, provided in relevant part: "Every person who maliciously and wilfully disturbs the peace . . . by tumultuous or offensive conduct or [uses] any vulgar, profane, or indecent language within the presence or hearing of women or children, in a loud or boisterous manner, is guilty of a misdemeanor . . . ."

Fifty years ago the words "damn" and "hell" were as shocking to the sensibilities of some people as the Callahan epithet is to others today.[7] The first word in Callahan's epithet has many meanings. When speaking about coitus, not everyone can be an F. E. Smith (later Earl of Birkenhead) who, in his speech in 1920 in the House of Commons on the Matrimonial Causes Act, referred to "that bond by which nature in its ingenious telepathy has contrived to secure and render agreeable the perpetuation of the species."

A farmer when asked why he struck his mule on the head with a two by four responded, "I am trying to get his attention." Here Dr. Callahan was trying to get the officer's attention to a situation he perceived as requiring medical attention. Under these circumstances, Callahan's epithet was not inherently likely to provoke an immediate violent reaction. The record shows the officer was neither offended by Callahan's foul language nor provoked to react violently (*Cohen* v. *California, supra,* 403 U.S. 15, 20 [29 L.Ed.2d 284, 291]). His only concern was not to be interrupted in performing his duty. The incident lasted 10 to 20 minutes, during which Callahan uttered many profanities, dulling the senses as he argued for medical attention. Officer George warned Callahan several times to stop interfering with him and finally said if Callahan interfered once more he would arrest him for delaying an officer in violation of Penal Code section 148. After that, anything Callahan did which George thought interfered would result in arrest. When Callahan uttered his epithet, George, true to his word, arrested him solely for interfering, for which the jury found Callahan not guilty. The fact Callahan used opprobrious words did not create a Penal Code section 415, subdivision (3) situation.

Judgment reversed.

Staniforth, J., and Butler, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 1, 1985.

The United States Supreme Court denied a petition for writ of certiorari on January 21, 1986.

---

[7]Who in that earlier generation can forget the shock wave generated by Clark Gable when as Rhett Butler he said to Scarlett, "Frankly, my dear, I don't give a damn." (Sidney Howard, screenplay for Gone With the Wind (1939).) Also, "My dear, I don't give a damn." (Rhett Butler to Scarlett O'Hara in Gone With the Wind, Margaret Mitchell (1936).) (Familiar Quotations, John Bartlett (15th ed. 1980) p. 848.)