[No. B073818. Second Dist., Div. Six. Aug. 23, 1994.]

NORTH COUNTY CONTRACTOR'S ASSOCIATION, INC., Defendant, Cross-complainant, Cross-defendant and Appellant, v. TOUCHSTONE INSURANCE SERVICES, Defendants, Cross-complainants, Cross-defendants and Respondents.

**COUNSEL**

Ellis & Collins and Samuel D. Ellis for Defendant, Cross-complainant, Cross-defendant and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Mark G. Bonino and Ida Samawi Skikos for Defendants, Cross-complainants, Cross-defendants and Respondents.

**OPINION**

**GILBERT, J.**—The courts try to provide a semblance of certainty in an otherwise uncertain world. Perhaps that is why judges are reputed to feel uncomfortable about making educated guesses. Such discomfort is

unwarranted when a judge must decide whether a settlement is made in good faith. In such cases judges are required to make educated guesses.

Here we hold that the trial Judge did not abuse his discretion when he granted a motion for good faith settlement. The settling defendants had limited assets, and it was questionable whether they had insurance coverage. The Judge therefore made an educated guess based on the factors set forth in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159], that the settlement was in the "ballpark."

North County Contractor's Association, Inc. (NCCA) appeals from a judgment dismissing its cross-complaint for equitable indemnity against Elmer Belmont, individually and doing business as Touchstone Insurance Services, Craig Belmont, Cyndi Belmont, and David Belmont (Touchstone). The cross-complaint was dismissed after the trial court granted Touchstone's motion to approve a $105,000 good faith settlement. (Code Civ. Proc., § 877.6.)[1] NCCA contends that the trial court erred because the settlement was disproportionately low. The trial court's educated guess was well within the "ballpark." We affirm.

The Affiliated Builders Association Health Trust (plan), a self-insured health care plan failed when the medical claims exceeded plan reserves. Eighty-six plan members brought suit for breach of contract and fraud. Those defendants included: (1) David Baker, executive director of NCCA, a nonprofit trade group, (2) Elmer Belmont, who through his company Touchstone Insurance Services and its employees, David Belmont, Craig Belmont and Cyndi Belmont, marketed the plan, (3) Bob Markwith and Ed Addy, who through their company Stop-Loss Concepts, Inc., acted as underwriters, (4) Mark Poulson, who through his company, Corporate Benefits Administrators and Consultants, Inc., acted as the third party administrator for the plan, and (5) Arart Administrators, Inc., who in the later part of 1989 took over as third party administrator.

After the action was brought, Baker, Poulson, and Markwith filed petitions in bankruptcy.

Thereafter, the remaining defendants participated in a two-day settlement conference. The plaintiffs agreed to settle for $1.2 million based on the following settlement contributions: Arart—$20,000, Touchstone (through its insurance carrier The Hartford)—$100,000, Elmer Belmont—$5,000, NCCA (through its insurance carrier General Accident)—$1 million, NCCA and its

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

officers and directors—$75,000. NCCA opposed the $105,000 Touchstone/ Belmont settlement and reserved the right to seek indemnity and contribution against Touchstone.

Touchstone and Belmont thereafter brought a motion for good faith settlement. (§ 877.6.) The moving papers showed that Touchstone was insured by Hartford and had a comprehensive general liability policy with policy limits of $1 million for bodily injury and $100,000 for advertising injury. Hartford, however, denied coverage. Touchstone retained counsel to defend against the action and seek coverage under the policy. Hartford later issued a reservation of rights letter and agreed to defend under the advertising injury section of the policy.

The motion for good faith settlement further showed that the settlement judge was advised of the coverage problem. During the settlement discussions, the trial court was advised that Elmer Belmont's business and home were worth less than $25,000. In order to settle the case, Hartford agreed to pay $100,000 policy limits under the advertising injury portion of the policy. Belmont agreed to contribute $5,000 towards the settlement.

NCCA opposed the motion for good faith settlement, contending that Touchstone had another $1 million in insurance coverage. NCCA argued that Touchstone should pay more because its liability was equal to that of NCCA. The trial court disagreed and granted the motion for good faith settlement. In doing so, it dismissed the cross-complaints against Touchstone for indemnity and contribution. NCCA appealed.

DISCUSSION

A. *The Law Governing Good Faith Settlements.*

A settlement made in good faith by a defendant discharges the settling defendant from liability for contribution or equitable indemnity to any other joint tortfeasor or co-obligor. (§§ 877, 877.6; *Far West Financial Corp.* v. *D & S Co.* (1988) 46 Cal.3d 796, 809 [251 Cal.Rptr. 202, 760 P.2d 399].) Sections 877 and 877.6 promote competing goals: ". . . the equitable sharing of costs among the parties at fault and the encouragement of relief settlements." (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 871-872 [239 Cal.Rptr. 626, 741 P.2d 124].)

Good faith may be found only if there has been no collusion between the settling parties and where the settlement amount appears to be within the "reasonable range" of the settling party's proportionate share of comparative

liability for a plaintiff's injuries. (*River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498].)

That "reasonable range" is about as close to certainty as the elusive good faith settlement can come. A conscientious judge's search for certainty can sometimes end in disappointment because in some cases, certainty is more a phantom than a reality.

As Oliver Wendell Holmes explained: "The language of judicial decision is mainly the language of logic. And the logical method and form flatter that longing for certainty and for repose which is in every human mind. But certainty generally is illusion, and repose is not the destiny of man. Behind the logical form lies a judgment as to the relative worth and importance of competing legislative grounds, often an inarticulate and unconscious judgment, it is true, and yet the very root and nerve of the whole proceeding." (Holmes, *The Path of the Law* (1897) 10 Harv. L.Rev. 457, 465-466.)

When confronted with motions for good faith settlements, judges should reflect on Holmes's insight, and not yearn for the unreal goal of mathematical certainty. Because the application of section 877.6 requires an educated guess as to what may occur should the case go to trial, all that can be expected is an estimate, not a definitive conclusion. That estimate requires that the trial judge inquire into a number of relevant factors, which are: the amount offered in settlement in relation to plaintiff's potential recovery; the settlor's proportionate liability; the lack of wrongful conduct; insurance policy limits; the settlor's financial condition; and the allocation of settlement proceeds among the plaintiffs. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra*, 38 Cal.3d at p. 499.) A judge charting the boundaries of good faith of necessity must avoid a rigid application of the factors set forth in *Tech-Bilt*. The judge should make an educated guess whether the settlement approximates the settling defendant's apportionment of liability and is not grossly disproportionate to the settlor's fair share of anticipated damages. (See *Abbott Ford, Inc.* v. *Superior Court, supra*, 43 Cal.3d at pp. 873-875.)

■ Although an offer of settlement must bear some relationship to one's proportionate liability, bad faith is not " 'established by a showing that a settling defendant paid less than his theoretical proportionate or fair share.' [Citation.]" (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra*, 38 Cal.3d at p. 499.) In other words, "a 'good faith' settlement does not call for perfect or even nearly perfect apportionment of liability." (*Abbott Ford, Inc.* v. *Superior Court, supra*, 43 Cal.3d at p. 874.) All that is necessary is that

there be a "rough approximation" between a settling tortfeasor's offer of settlement and his proportionate liability. (*Bay Development, Ltd.* v. *Superior Court* (1990) 50 Cal.3d 1012, 1027-1028 [269 Cal.Rptr. 720, 791 P.2d 290].)

The burden is upon the party objecting to the proposed settlement to prove an absence of good faith. (§ 877.6.) The challenger must prove "the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at pp. 499-500.) By enacting sections 877 and 877.6, the Legislature has "incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit." (*River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d at p. 997.)

B. *There Was Substantial Evidence Before the Trial Court From Which It Could Properly Find That the Settlement Tendered by Touchstone Fell Within the Guidelines of Tech-Bilt.*

We must determine whether substantial evidence supports the trial court's determination that the settlement here was in the "ballpark" and made in good faith. (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 871 [269 Cal.Rptr. 647]; *Barajas* v. *USA Petroleum Corp.* (1986) 184 Cal.App.3d 974, 987 [229 Cal.Rptr. 513].)

*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at pages 499-500, tells us that good faith settlements that are in the "ballpark" are valid. Popular words or expressions that enjoy evanescent currency do not retain their capacity to enlighten over time. That, however, is not the case with "ballpark." "Ballpark" is the ideal metaphor that gives us an enduring standard, instantly recognizable.

" 'Baseball has been the national pastime for over one hundred years and enjoys a unique place in our American heritage.' " (*Flood* v. *Kuhn* (1972) 407 U.S. 258, 266 [32 L.Ed.2d 728, 734-735, 92 S.Ct. 2099].) The relation of good faith settlement to baseball is particularly appropriate because that quintessential American sport is based on skill, fairness, reason and pragmatism. These are all qualities that trial judges use in making an educated guess as to whether a settlement is made in good faith. The practice is both appropriate and necessary.

"In a nation that has had a century-long love affair with baseball, it is not surprising that ballparks play a special role in the lives of Americans."

(Ritter: Lost Ballparks (1992) p. 1.) The dimensions and playing surfaces of ball parks are anything but uniform. The differences in the size of foul territory, kind of playing surface, prevailing wind direction, and depth of outfield fences affect the performance of ball players. Consequently, certain ball parks are the favorite venue for hitters (e.g., Chicago's Wrigley Field and Boston's Fenway Park), while other parks are havens for pitchers (e.g., Oakland's Coliseum and Dodger Stadium). (Thorn & Palmer, Total Baseball (1989) p. 2199.)[2]

Equally diverse are the multifaceted elements, talents, personalities, and luck that shape the outcome of a given case. For a list of players who would attest to this principle, see *Flood* v. *Kuhn, supra,* 407 U.S. 258, 262-263 [32 L.Ed.2d 728, 732-733]; *Philadelphia Ball Club Ltd.* v. *Lajoie* (1902) 202 Pa. 210 [51 A. 973]; Commentary, *In re Brett: The Sticky Problem of Statutory Construction* (1983) 52 Fordham L.Rev. 430; For Lawyers, see *People* v. *Callahan* (1985) 168 Cal.App.3d 631, 634 [214 Cal.Rptr. 294].

██ Bearing the foregoing in mind, we consider NCCA's argument that the Touchstone settlement was completely out of the "ballpark."[3]

The trial court had before it Touchstone's policy of insurance issued by Hartford and heard argument concerning coverage under that policy. The Hartford policy limited coverage to an "occurrence," defined in the policy to mean "an accident . . . which results in bodily *injury* or *property damage* neither expected nor intended from the standpoint of the *insured.* . . ." (Hartford policy, Section II—Definitions, p. 18.) The policy also excluded coverage for "*bodily injury* or *property damage* arising out of the rendering or failure to render professional services." (Hartford policy, Section II—Exclusions, p. 9.) A similar exclusion did not exist for claims based on an advertising injury. (*Id.,* at p. 10.)

The first amended complaint alleged that Touchstone conspired with others to defraud plaintiffs and "formulated a scheme and conspiracy to

---

[2]"Tempted by the beckoning Green Monster [315 feet from home plate in left field], right-handed batters who normally punch the ball to right field trying for singles and doubles tend to think *home run* as they approach the batter's box at Fenway." (Ritter, Lost Ballparks, *supra,* at p. 3.) In 13 seasons, Joe DiMaggio of the New York Yankees hit 361 home runs. (See James Historical Baseball Abstract (1986) p. 600; Thorn & Palmer, Total Baseball, *supra,* p. 1071.) DiMaggio might have hit as many as 600 home runs had he played for the Boston Red Sox. (See James, Historical Baseball Abstract, *supra,* p. 390.) This is because many a fly ball hit by DiMaggio out to the cavernous reaches of left-center field at Yankee Stadium (otherwise known as "Death Valley") would have been home runs because of the much shorter distance to the left field wall at Boston's Fenway Park.

[3]NCCA does not claim that Belmont's individual settlement for $5,000 was in bad faith.

tortiously market and administer a group health and life insurance plan." The trial court, in approving the motion for good faith settlement, made an implied finding that at best, Touchstone's insurance coverage related to an advertising injury.

NCCA's allegation of wrongdoing on the part of Touchstone reminds us of the infield fly rule. It, too, has its roots in the ethical and moral precept that an infielder will not be permitted to enjoy the fruits of his or her devious conduct.[4] (Civ. Code, § 3517; Aside, *The Common Law Origins of the Infield Fly Rule, supra,* 123 U.Pa. L.Rev. at pp. 1478-1479.) These precepts also apply to litigants. (Civ. Code, § 3517.)

If such devious conduct occurred here, Touchstone would be blameworthy, but Hartford most likely would have had no duty to indemnify for liability based on breach of contract or fraud. (*Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1317 [241 Cal.Rptr. 427] [action premised on breach of contract excluded from coverage]; *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 861-862 [13 Cal.Rptr.2d 318] [negligent misrepresentation excluded from coverage]; *Dykstra* v. *Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 368 [17 Cal.Rptr.2d 543] [negligent misrepresentation and breach of fiduciary duty]; *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 539 [12 Cal.Rptr.2d 629] [fraud and intentional tort].) Liability based on a conspiracy to defraud others is not an unexpected or unintended "occurrence." (*Ibid.*)

The remaining causes of action were predicated on Touchstone's failure to render professional services as an insurance broker. Those claims were excluded under the bodily injury portion of the policy. (E.g., *Hollingsworth* v. *Commercial Union Ins. Co.* (1989) 208 Cal.App.3d 800, 810 [256 Cal.Rptr. 357] [ear-piercing constitutes a professional service within the meaning of similar policy exclusion]; *Northern Insurance Co.* v. *Superior Court* (1979) 91 Cal.App.3d 541, 543 [154 Cal.Rptr. 198] [medical record foul-up resulting in abortion on wrong patient not subject to coverage]; *Antles* v. *Aetna Casualty & Surety Co.* (1963) 221 Cal.App.2d 438, 442-443

---

[4]Prior to the enactment of this rule, base runners would be given a Hobson's choice that was dependent upon the actions of an infielder. If they were to run and the ball were caught, they could easily be tagged out for having left the base before the catch; if they were to stay on the base and the ball were intentionally dropped, they would have to run and thereby be forced out at the next base. Thus, a devious infielder could start a rally-killing double play by simply intentionally allowing an easy pop fly to drop. This situation gave the defense "an advantage that it did not deserve and that the offense could not have prevented." (Aside, *The Common Law Origins of the Infield Fly Rule* (1975) 123 U.Pa. L.Rev. 1474, 1477.)

[34 Cal.Rptr. 508] [no coverage where chiropractic patient burned by heat lamp].)

Assuming that NCCA had a comprehensive general liability policy similar to the Hartford policy, NCCA would have had more coverage. NCCA was a trade association and sponsored the plan. The first amended complaint alleged a separate cause of action against NCCA for negligent endorsement of the plan. Because NCCA provided no professional services, coverage was available under the bodily injury portion of NCCA's policy.

NCCA cites *City of Grand Terrace* v. *Superior Court* (1987) 192 Cal.App.3d 1251 [238 Cal.Rptr. 119] for the rule that a trial court must consider insurance policy limits and the wealth of the settling defendant. There, the trial court granted a motion for good faith settlement based on the defendant's representation that insurance coverage was unavailable under a family member exclusion endorsement. The Court of Appeal reversed because the policy was not provided to the trial court and no evidence was presented concerning the wealth of the settling defendant. (*Id.*, at p 1264.)

The instant case is distinguishable. Substantial evidence was presented that Touchstone was worth less than $25,000. The trial court reviewed the Hartford policy and letters denying coverage. Although the court thought the letters were "ambiguous," it concluded that no additional coverage existed for settlement purposes. NCCA could have conducted additional discovery and moved to continue the hearing. (*Spectra-Physics, Inc.* v. *Superior Court* (1988) 198 Cal.App.3d 1487, 1492 [244 Cal.Rptr. 258]; *City of Grand Terrace* v. *Superior Court, supra,* 192 Cal.App.3d 1251, 1265.) It failed to do so. Based on the evidence before it, the trial court reasonably concluded that the settlement took into account all available coverage. (See *County of Los Angeles* v. *Guerrero* (1989) 209 Cal.App.3d 1149, 1157-1158 [257 Cal.Rptr. 787] [settlor's modest financial condition and insurance policy limits overrode other *Tech-Bilt* factors]; *Schmid* v. *Superior Court* (1988) 205 Cal.App.3d 1244, 1246 [253 Cal.Rptr. 137] [settlement for policy limits in good faith].)

"[T]he determinant of good faith is not the liability figure ultimately reached at trial, but whether the settlement is grossly disproportionate to what a reasonable person, at the time of the settlement would estimate the settling defendant's liability to be. [Citation.]" (*Barth-Wittmore Ins.* v. *H.R. Murphy Enterprises, Inc.* (1985) 169 Cal.App.3d 124, 132 [214 Cal.Rptr. 894].) In the present case, the evidence did not show that the settlement was collusive or "so far out of the ballpark" as to lack good faith. The trial court

did not abuse its discretion as a matter of law in granting the motion for good faith settlement.[5]

The trial court has wide discretion in deciding whether a settlement is in good faith and in arriving at an allocation of valuation of the various interests involved. (*Erreca's* v. *Superior Court* (1993) 19 Cal.App.4th 1475, 1495-1496 [24 Cal.Rptr.2d 156].) Reversal of a trial court's discretion is more likely to occur when the settlement is like a pitch tossed by Satchel Paige. That's one that " '. . . ain't never been seen by this generation.' " (Dickson, Baseball's Greatest Quotations (1991) p. 331.)[6]

An educated guess is the best a judge can do when deciding whether a settlement is made in good faith. Even the wisest judge rarely has powers to "prophesy with a wink of his eye, peep with security into futurity . . . ."[7]

The judgment is affirmed with costs to respondents.

Stone (S. J.), P. J., and Yegan, J., concurred.

---

[5]Although unnecessary to our decision, we note that after the motion for good faith settlement was granted, the plaintiffs proceeded to trial against the nonsettling defendants, Corporate Benefits Administrators and Consultants, Inc., and Stop-Loss Concepts, Inc. The trial court awarded $6.8 million and determined that the total economic losses of the settling and nonsettling plaintiffs was $1,380,258. The trial court was asked to apportion fault and found that Touchstone was 20 percent at fault and NCCA was 8 percent at fault.

Had Touchstone not settled, its liability for purposes of indemnification would have been $276,051. When the motion for good faith settlement was heard, NCCA argued that NCCA and Touchstone had equal liability. Based on NCCA's analysis, Touchstone's liability for purposes of indemnification was $110,420 (8 percent comparative fault). We decline to find, as a matter of law, that the $105,000 settlement was grossly disproportionate.

[6]" 'Satchelfoot. Satchel. Satch. Long, lean, canny. Threw the ball from any of three directions. Had four different windups. Had more pitches than a catcher has fingers . . . .' " (Rex Lardner, quoted in Dickson, Baseball's Greatest Quotations, *supra*, at p. 237.)

[7]Gilbert and Sullivan, The Sorcerer, Act 1.