[No. B210470. Second Dist., Div. Three. Mar. 26, 2009.]

LONG BEACH MEMORIAL MEDICAL CENTER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MAKYA CONNORS, a Minor, etc., et al., Real Parties in Interest.

COUNSEL

Sinclitico & Burns, Dennis J. Sinclitico; Horvitz & Levy, David M. Axelrad and David S. Ettinger for Petitioner.

No appearance for Respondent.

Cole Pedroza, Curtis A. Cole, Joshua C. Traver; Law & Brandmeyer, Yuk K. Law and Gregory R. Bunch for Real Parties in Interest.

**OPINION**

**ALDRICH, J.—**

INTRODUCTION

This writ proceeding arises in a medical negligence action in which plaintiffs, Makya Connors, a minor, by and through her guardian ad litem Anthony Hill, and Tamara Hill, individually (together plaintiffs), reached a settlement in excess of $8 million with four defendants, including Long Beach Memorial Medical Center (the hospital) and Fastaff, Inc., defendant nurse's employer. Shortly after the settlement was placed on the record in open court, perinatologist Tamerou Asrat, M.D., and his employer, Magella Medical Group (together the physicians) settled separately with plaintiffs for $200,000, equaling less than 2 percent of the amount at issue and 10 percent of their insurance coverage. The trial court found the physicians' settlement was made in good faith (Code Civ. Proc., § 877.6),[1] thus precluding the hospital from seeking equitable indemnity from the physicians. The hospital petitioned for a writ of mandate challenging the good faith determination. We conclude that the trial court abused its discretion in finding that the settlement between the physicians and plaintiffs was in good faith. Accordingly, we grant the petition and direct the trial court to vacate that order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Labor and delivery*

Hill was a high-risk patient and so she was under the care of the physicians during labor and delivery. At 1:31 a.m. on February 5, 2006, Dwanda M. Trask, R.N., a nonparty nurse employed by Fastaff, Inc., administered Pitocin to augment Hill's labor and placed the patient on an electronic fetal heart monitor. Fetal heart monitor tracings can be viewed from the patient's room, the nurses' station, and the doctors' lounge.

At around 4:30 a.m., the fetal heart monitor began to show abnormalities. Dr. Asrat visited the patient at 4:45 a.m. and noted that she was completely

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

dilated, 100 percent effaced, and ready to begin "pushing." He also noted at that time that the fetal heart tracings were abnormal, but he did not check on his patient again until 8:06 a.m.

Meanwhile, Dr. Asrat was in the hospital at all relevant times. No other physicians were responsible for Hill's care during Dr. Asrat's shift from February 5 to 6, 2006. Nor were there residents checking on Hill during her labor that night. In the period between 3:00 and 7:00 a.m. on February 5, 2006, there were five patients in labor and delivery for whom Dr. Asrat was the attending obstetrical physician. Between 7:00 and 9:00 a.m., he was responsible for four such patients.

Sometime between 5:11 and 5:20 a.m., Nurse Trask testified, she called Dr. Asrat to inform him that she had turned off the Pitocin and repositioned the patient, and that there were some late decelerations in the fetal heart rate. Nurse Trask reached Dr. Asrat in the doctors' lounge where there was a monitor showing the fetal heart monitor tracings. According to Nurse Trask, Dr. Asrat responded that he would continue to monitor the fetal heartbeat pattern to see whether it resolved itself once the Pitocin was turned off.

Dr. Asrat denied having the 5:11 a.m. conversation with Nurse Trask or being told between 4:45 and 7:13 a.m. that there were repetitive late decelerations on the heart tracings. Rather, Dr. Asrat testified that had he been given the information that Nurse Trask claims to have relayed to him at 5:11 a.m., he would have "immediately" gone to evaluate the patient. Nurse Trask's 5:11 a.m. call was not noted in the medical records.

Nurse Trask again called Dr. Asrat in the doctors' lounge at 7:13 a.m. and informed him that the baby was not properly "stationed" despite the fact that the patient had been pushing for two hours. She also testified that she told Dr. Asrat that the fetal heart rate had several persistent variable decelerations and periods of late decelerations. She did not *advise* Dr. Asrat that the baby could not tolerate any more pushing, she explained, because he would know that, given her report and his ability to view the fetal heart tracings in the doctors' lounge. Dr. Asrat responded to Nurse Trask that he would make a decision within the next hour.

Admitting he received the nurse's 7:13 a.m. call, Dr. Asrat denied she mentioned any problems, and so he understood the tracings were "reassuring." Had he been told about the abnormal tracings, Dr. Asrat testified, he would have gone to see the patient.

At 7:23 a.m., Nurse Theresa Ann Krehbiel, R.N., took over the patient's care. At 8:00 a.m., the nurse coordinator reviewed the fetal tracings and

requested that Dr. Asrat evaluate the patient "stat." Dr. Asrat arrived at 8:06 a.m., reviewed the fetal heart monitor tracings and ordered a "crash," or emergency, Cesarean section. Dr. Asrat denied having any information about the patient's condition before the 8:00 a.m. call and maintains that when Nurse Krehbiel assumed the patient's care, the fetal tracings were troubling, with recurrent late decelerations and slow return to the baseline, with the result that the baby should have been delivered as soon as practicable. He explained that had he been informed of the infant's condition at 6:40 a.m., he would have gone to the patient's room and *may* have called for a Cesarean section. The fetal heart rate tracings did not begin to be of concern until around 6:30 a.m., he testified, which was when he should have been called. The child was born at 9:01 a.m. and the Apgar scores were consistent with ongoing neurological damage. Plaintiffs filed their complaint alleging causes of action for negligence and emotional distress.

### 2. *The deposition testimony of plaintiffs' expert, Dr. Manning*

Plaintiff's perinatology expert, Frank Arthur Manning, M.D., enumerated Dr. Asrat's breaches of the standard of care. Based on the fact that the abnormal fetal heart rate was present at Dr. Asrat's 4:45 a.m. visit, the expert opined, "it was required for [Dr. Asrat] by the standard of care to define a plan for her management . . . that he had to continue the ongoing care of his patient and determine what was going to happen to her . . . . [W]ithin 30 minutes [of the 4:45 a.m. visit] he should have been reassessing her and establishing a plan." The expert felt "quite strongly about this . . . that [Dr. Asrat] should not have left the patient's room at 4:55 a.m. or there-abouts." Dr. Manning stated: "I think the standard of care required the attending physician . . . not to *abandon the patient*, so that the obstetri-cian cannot leave the room . . . without a defined plan." (Italics added.) Dr. Manning also testified that Dr. Asrat continuously breached the standard of care by failing to return to see the patient for over three hours. Even accepting Dr. Asrat did not receive Nurse Trask's 5:11 a.m. call, Dr. Manning opined, Dr. Asrat should have come in to see the patient. "At 5:45 this baby, if it's not going to deliver spontaneously, should be delivered by Caesarean section . . . by 5:45."

### 3. *The settlement*

Plaintiffs calculated that their damages, including future care, lost future earnings, and past medical expenses, would exceed $10 million. Hence, plaintiffs made a settlement demand in 2007 of $8 million. The demand was "global," meaning plaintiffs would not settle with defendants individually.

After mediation, two tortfeasors, who are not parties to this proceeding, settled for $250,000. That left $7.75 million as the remainder of plaintiffs'

global demand. After a second apparently unsuccessful mediation session, counsel for the physicians indicated his clients' willingness to explore the possibility of defendants contributing to a settlement and arbitrating the relative percentages later. The parties discussed a proposal whereby the physicians would pay $1.5 million, Fastaff would furnish $2 million, and the hospital would supply $4 million to a global settlement, subject to a final allocation of respective contributions in binding arbitration. These conversations occurred about two weeks prior to the April 16, 2008 final status conference. Plaintiffs soon stated that unless their demand was met by April 15, 2008, their offer would be withdrawn and increased. On April 14, 2008, Fastaff agreed to pay $2.5 million and the hospital consented to paying $5.25 million.

As for the physicians, the hospital understood that they had no settlement authority. But, *the day after* the hospital and Fastaff reached a settlement, the physicians' attorney contacted plaintiffs' counsel. When plaintiffs confirmed that the agreed settlement did not include them, counsel for the physicians offered plaintiffs $200,000 as separate, additional, new money in return for a dismissal of his clients from the lawsuit.

*Just hours* after the hospital and Fastaff put their settlement on the record on April 16, 2008, the hospital learned of Dr. Asrat's $200,000 settlement.

### 4. *The motion of the physicians for good faith determination*

Six days later, the physicians moved for a good faith determination. The physicians argued that there was no evidence they colluded with plaintiffs and the $200,000 settlement figure was large enough to encompass the allegations made against them. They argued further that the fact the hospital and Fastaff opted to pay $7.75 million to avoid trial did not make the physicians' subsequent $200,000 settlement in "bad faith." Finally, the physicians argued that they believed they would be successful at trial because Dr. Asrat had no liability. In support of that position, the physicians submitted the declaration of T. Murphy Goodwin, M.D., who had not been deposed. Dr. Goodwin declared that "[w]hen a perinatologist is busy, as Dr. Asrat was, it is within the standard of care for that perinatologist to rely on the obstetrical nurses to keep him up to date and to notify him of abnormalities in the labor or the fetal heart rate tracings." In Dr. Goodwin's view, "had the nurses recognized the abnormal fetal heart rate tracings and notified Dr. Asrat as early as around 6:30 a.m., it is more likely than not that the baby would not have sustained the type or extent of neurological injuries she presented at birth . . . ." The physicians also submitted the declaration of their attorney attesting that he did not have settlement authority until two days after the hospital and Fastaff had settled with plaintiffs.

In its opposition, the hospital argued that the settlement was disproportionate and hence inadequate to bar the hospital's contribution rights and that the physicians' attorney engaged in bad faith tactics to avoid paying $1.5 million towards the global settlement as earlier discussed. The hospital observed that the physicians' settlement contribution was less than 2 percent of plaintiffs' claimed damages, and only 10 percent of Dr. Asrat's insurance coverage, whereas plaintiffs' counsel reckoned that Dr. Asrat was between 25 and 50 percent at fault.

The trial court granted the motion for good faith determination, finding the physicians' settlement was entered into in good faith. The hospital petitioned this court (§ 877.6, subd. (e)) seeking an order vacating the trial court's good faith finding. It contended the physicians' settlement was entirely disproportionate to Dr. Asrat's liability, and the physicians' attorney's refusal to participate in settlement negotiations was bad faith conduct. We issued an order to show cause why we should not vacate the order finding the settlement to be in good faith.

## DISCUSSION

### 1. *The law of good faith settlement determinations*

■ Under section 877.6, "[a]ny party to an action in which it is alleged that two or more parties are joint tortfeasors . . . shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . . ." (*Id.*, subd. (a)(1).) The trial court determines the good faith of a settlement "on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing." (*Id.*, subd. (b).) The determination that the settlement was made in good faith bars any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution or comparative indemnity. (*Id.*, subd. (c).)

Equity is the aim of section 877.6. The dual equitable goals of section 877.6 are "equitable sharing of costs among the parties at fault and encouragement of settlements. [Citation.]" (*Mattco Forge, Inc. v. Arthur Young & Co.* (1995) 38 Cal.App.4th 1337, 1349 [45 Cal.Rptr.2d 581] (*Mattco Forge*).) "Good faith may be found only if there has been no collusion between the settling parties and where the settlement amount appears to be within the 'reasonable range' of the settling party's proportionate share of comparative liability for a plaintiff's injuries. [Citation.]" (*North County Contractor's Assn. v. Touchstone Ins. Services* (1994) 27 Cal.App.4th 1085, 1089–1090.)

■ In *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] (*Tech-Bilt*), the Supreme Court set forth the relevant factors. They include, "a rough approximation of plaintiff's total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than [he would] if [he were] found liable after a trial." (*Mattco Forge, supra*, 38 Cal.App.4th at p. 1349, citing *Tech-Bilt, supra*, at p. 499.)

Other considerations are "the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud or tortious conduct aimed at injuring the interests of nonsettling defendants. [Citation.]" (*Mattco Forge, supra*, 38 Cal.App.4th at p. 1349.)

Another key factor is the settling tortfeasor's potential liability for indemnity to joint tortfeasors. (*Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 816, fn. 16 [251 Cal.Rptr. 202, 760 P.2d 399].) The trial court calculates "the culpability of the [settling] tortfeasor vis-à-vis other parties alleged to be responsible for the same injury. Potential liability for indemnity to a nonsettling defendant *is an important consideration for the trial court* in determining whether to approve a settlement by an alleged tortfeasor. [Citation.]" (*TSI Seismic Tenant Space, Inc. v. Superior Court* (2007) 149 Cal.App.4th 159, 166 [56 Cal.Rptr.3d 751], italics added.)

■ As we explained in *Mattco Forge, supra*, 38 Cal.App.4th 1337, "whether a settlement is in good faith is a matter left to the discretion of the trial court. [Citation.]" (*Id.* at p. 1349.) The trial court's discretion, however, in ruling on a motion under section 877.6 is not unlimited and should be exercised in view of the equitable goals of the statute, in conformity with the spirit of the law and in a manner that serves the interests of justice. (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1420 [86 Cal.Rptr.3d 457].) The party asserting lack of good faith bears the burden of proof. (§ 877.6, subd. (d).) That party must show that the settlement is so far " 'out of the ballpark' " as to be inconsistent with the equitable goals of section 877.6. (*Tech-Bilt, supra*, 38 Cal.3d at pp. 499–500.)

2. *Application of the factors to this case shows that the trial court abused its discretion in granting the physicians' motion for good faith determination.*

The settling party's proportionate liability is one of the most important factors. (*Mattco Forge, supra*, 38 Cal.App.4th at p. 1350.) The hospital contends that the physicians' $200,000 settlement—representing 2 percent of plaintiffs' $10 million damages estimate—was so far out of the "ballpark" it

was not even in the parking lot. The physicians counter that their settlement was in good faith because there was substantial evidence to support the trial court's determination that Dr. Asrat had absolutely no liability exposure and so their offer was simply a nuisance value settlement where the $200,000 represented merely defense costs and expert fees for a four-week trial. The physicians' contention is unavailing.

■ The good faith evaluation must "be made on the basis of information available *at the time of settlement.* [Citation.] ' "[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." [Citation.]' [Citation.]" (*Mattco Forge, supra,* 38 Cal.App.4th at p. 1349, italics added.) The physicians first filed the declaration of Dr. Goodwin—who had not been deposed—*after* plaintiffs accepted the physicians' offer and so Dr. Goodwin's opinion was not available at the time of settlement for purposes of reckoning Dr. Asrat's proportionate liability.

Even accepting, however, that Dr. Goodwin's declaration raises a dispute about whether Dr. Asrat was negligent and about his proportionate share of liability, the payment of $200,000 in settlement for an $8 million claim was wholly disproportionate. Even a slight probability of liability on Dr. Asrat's part would warrant a contribution more significant than 2 percent. (See *Tech-Bilt, supra,* 38 Cal.3d at p. 497.) Here, the parties deposed Dr. Manning who testified about Dr. Asrat's multiple breaches of the standard of care and about his duty to monitor the patient's condition regardless of whether the nurses contacted him. The evidence shows that Dr. Asrat was the sole physician responsible for Hill's high-risk labor and delivery, who knew about the abnormal fetal heart tracings at 4:45 a.m., and was always able to review the heart monitor tracings from numerous places in the hospital, including the doctors' lounge, and who remained in the hospital at all times but did not return to the patient's room on his own initiative until 8:00 a.m. Plaintiffs' attorney was prepared to argue to the jury that Dr. Asrat bore significant responsibility and was substantially liable. And the physicians' own counsel effectively admitted during settlement discussions that Dr. Asrat's fair share of the liability was around $1.5 million. In short, there was evidence not only that Dr. Asrat was at fault, but that his fault was not de minimis and so it simply cannot be said that Dr. Asrat was *not* liable *as a matter of law.* (*TSI Seismic Tenant Space, Inc. v. Superior Court, supra,* 149 Cal.App.4th at p. 167.) Accordingly, the trial court abused its discretion as a matter of law by failing to consider the merits of the hospital's evidence where the $200,000 amount the physicians paid bears no rational relationship to their proportionate share of liability for plaintiffs' damages.

Another relevant factor, the settling party's financial condition and insurance policy limits (*Mattco Forge, supra,* 38 Cal.App.4th at p. 1352), also

militates against a good faith determination here. The hospital's opposition shows that the physicians together had liability insurance capped at $2 million, with the result that their settlement constituted only 10 percent of their available policy limits. While a disproportionately low settlement amount may be reasonable where the settling joint tortfeasor is relatively insolvent and uninsured or underinsured (*ibid.*), we are not faced with such a case here. The physicians' settlement is simply not defensible in view of their financial condition and policy limits. (*Id.* at p. 1353.)

Most significant for our purposes, however, is the settlor's potential liability for indemnity to the other alleged tortfeasors. This factor is "an important consideration for the trial court in determining whether to approve a settlement . . . ." (*TSI Seismic Tenant Space, Inc. v. Superior Court, supra,* 149 Cal.App.4th at p. 166.) The hospital argues at length that both the physicians and their attorneys used bad faith tactics during the two settlement mediation sessions. The physicians and their attorneys vigorously deny this. They also observe that "[n]o evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible . . . ." (Evid. Code, § 1119, subd. (a).) The confidentiality of statements made and materials used during mediation are also confidential after the mediation ends. (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 580 [80 Cal.Rptr.3d 83, 187 P.3d 934].) Therefore, we may not consider the statements made during mediation, although we may consider oral statements of the settlement terms. (*Ibid.*)

Nonetheless, the record of negotiations conducted *after* mediation concluded indicates here that the physicians' settlement with plaintiffs was designed to benefit the physicians at the expense of the interests of the hospital and Fastaff. (*Mattco Forge, supra,* 38 Cal.App.4th at p. 1349.) It was the physicians' attorneys who, during discovery, indicated the willingness to explore the possibility of the parties' contributing to a global settlement and later arbitrating the relative allocation of contributions. The physicians' suggestion triggered a discussion of a plan whereby the physicians would contribute $1.5 million, Fastaff would supply $2.5 million, and the hospital would pay $4 million. The hospital and Fastaff made their settlement offers on April 14, 2008. As for the physicians, their counsel reiterated they had no settlement authority; but they jumped in *the day after* the other defendants had settled by contacting plaintiffs and making a separate settlement offer of $200,000 in return for their dismissal. Less than a week later, the physicians moved for good faith settlement determination and submitted the declaration of an expert who had not been deposed.

More important than simply the conduct of the physicians and their attorneys during the settlement discussions, the timing of the physicians'

offer, outlined above, suggests only one result, namely, that the physicians' reason for entering into the settlement with plaintiffs was to cut off the hospital's and Fastaff's right to indemnity from the physicians. Certainly, if the timing were reversed and the physicians had made the first offer in settlement, they would not have offered so little an amount as $200,000, and we doubt plaintiffs would have accepted such an offer had it been made first. Plaintiffs' counsel indicated that plaintiffs accepted the physicians' $200,000 offer because plaintiffs were not enthusiastic about proceeding to trial against the physicians alone, and they had already obtained the amount demanded for settlement. Hence, by the time the physicians' counsel contacted plaintiffs' attorney to make an offer in settlement, *the physicians' liability exposure to the hospital for indemnity was far greater than their potential exposure to plaintiffs for negligence.* The true value in the settlement to the physicians, then, was not the dismissal of claims as to them, but rather the dismissal of the indemnity claims of the hospital and Fastaff. When a joint tortfeasor "enters into a disproportionately low settlement with the plaintiff solely to obtain immunity from the cross-complaint, the inference that the settlement was not made in good faith is difficult to avoid." (*Mattco Forge, supra*, 38 Cal.App.4th at p. 1354.) To immunize the physicians from the indemnity claims of the hospital and Fastaff under these circumstances, where Dr. Asrat was the sole physician responsible for the care of plaintiff during her labor and delivery, serves neither the goal of encouraging settlement *among all interested parties* nor the goal of equitably *allocating costs* among multiple tortfeasors. (*West v. Superior Court* (1994) 27 Cal.App.4th 1625, 1636 [34 Cal.Rptr.2d 409].) If section 877.6 is to serve the ends of justice, it must prevent a party from purchasing protection from its indemnification obligation at bargain-basement prices.

■ The final relevant factor here is collusion, fraud, or tortious conduct aimed at injuring the interests of the joint tortfeasors. (*Mattco Forge, supra*, 38 Cal.App.4th at p. 1353.) As explained, "[s]ection 877.6 is grounded in the equitable policies of the 'encouragement of settlements and the equitable allocation of costs among multiple tortfeasors.' [Citation.]" (*West v. Superior Court, supra*, 27 Cal.App.4th at p. 1636.) "The good faith provision of section 877 'mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives. . . . "Lack of good faith encompasses many kinds of behavior. It may characterize one or both sides to a settlement. When profit is involved, the ingenuity of man spawns limitless varieties of unfairness. . . ." ' [Citation.]" (*Mattco Forge, supra*, at p. 1353.) Here, the conclusion is inescapable that the physicians' offer was tactical and did not reflect the cooperative decisionmaking among all interested parties that is one of the aims of settlements. (See *Tech-Bilt, supra*, 38 Cal.3d at p. 497, quoting from *Commercial U. Ins. Co. v. Ford Motor Co.* (1981) 640 F.2d 210, 213–214.)

" '[A] settlement, to the extent that it is dictated by the tactical advantage of removing a deep-pocket defendant . . . is not made in "good faith" consideration of the relevant liability of all parties. . . .' [Citation.]" (*Tech-Bilt*, at p. 497.)

■ For the foregoing reasons, the trial court abused its discretion in determining that the physicians' settlement was in good faith.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its August 13, 2008 order finding the settlement agreement between the physicians and plaintiffs to be in good faith. Petitioner shall recover its costs in this proceeding.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied April 20, 2009, and on April 1, 2009, the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied June 24, 2009, S172707.