Filed 1/11/21 Cabrera v. Western Ag & Turf, Inc. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JUAN JOSE CABRERA, Plaintiff, v. WESTERN AG & TURF, INC. et al., Defendants, Cross-complainants and Appellants; PACIFIC PLASTICS, INC., Cross-defendant and Respondent. | F078996 (Super. Ct. No. 17CECG08856) **ORDER MODIFYING OPINION AND DENYING REQUEST FOR PUBLICATION** **[NO CHANGE IN JUDGMENT]** |
| WESTERN AG & TURF, INC. et al., Cross-complainants and Appellants, v. PACIFIC PLASTICS, INC., Cross-complainant and Respondent. | F079205 (Super. Ct. No. 17CECG02256) |

It is hereby ordered that the nonpublished opinion filed herein on December 17, 2020, be modified as follows:

On page 18, last paragraph that begins with "The *Tech-Bilt* factor…," the first three sentences should be deleted and replaced with the following:

The *Tech-Bilt* factor that was the focus of both the parties' arguments, and the court's analysis, was Pacific Plastics' proportionate liability. The court considered the evidence of the defendants' relative liability. Its ruling reflects its "educated guess" that Western Ag was primarily responsible for causing the bundle of pipes to fall on Cabrera, while the proportionate liability of Pacific Plastics was marginal, remote and speculative. (*North County*, *supra*, 27 Cal.App.4th at p. 1090.)

Except for the modifications set forth, the opinion previously filed remains unchanged. This modification does not effect a change in the judgment.

The request for publication of the opinion filed in the above entitled matter on January 6, 2021, is hereby denied. The opinion does not establish a new rule of law, nor does it meet any of the other criteria set forth in California Rules of Court, rule 8.1105(c).

In compliance with California Rules of Court, rule 8.1120(b), the Clerk/Executive Officer of this court shall transmit copies of the request for publication, the opinion, and this order to the Supreme Court.

                                             SMITH, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

SNAUFFER, J.

2

Filed 12/17/20  Cabrera v. Western Ag & Turf, Inc. CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JUAN JOSE CABRERA, <br><br> Plaintiff, <br><br> v. <br><br> WESTERN AG & TURF, INC. et al., <br><br> Defendants, Cross-complainants and Appellants; <br><br> PACIFIC PLASTICS, INC., <br><br> Cross-defendant and Respondent. | F078996 <br><br> (Super. Ct. No. 17CECG08856) <br><br> **OPINION** |
| WESTERN AG & TURF, INC. et al., <br><br> Cross-complainants and Appellants, <br><br> v. <br><br> PACIFIC PLASTICS, INC., <br><br> Cross-complainant and Respondent. | F079205 <br><br> (Super. Ct. No. 17CECG02256) <br><br> Fresno County |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Yempuku, Wetters & McNamara, Victoria Yamamoto; Greines, Martin, Stein & Richland, Robert A. Olson and Cynthia E. Tobisman, for Defendants, Cross-complainants and Appellants and for Cross-complainants and Appellants.

Wood, Smith, Henning & Bermann, Summit S. Dhillon, for Cross-defendant and Respondent, and for Cross-complainant, and Respondent.

-ooOoo-

This appeal arises from the trial court's granting of a motion for a good faith settlement determination. The underlying matter was a personal injury tort action, involving one plaintiff (Juan Cabrera) and two primary defendants and cross-complainants (Western Ag. & Turf, Inc. and Pacific Plastics, Inc.). Both defendants entered into direct settlements with the plaintiff, at the same time. Both defendants thereafter filed motions seeking a good faith settlement determination from the trial court. The trial court granted both motions. Western Ag. & Turf, Inc. opposed Pacific Plastics, Inc.'s motion for good faith settlement determination below, and now appeals the trial court's ruling thereon and the ensuing judgment. We affirm.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Juan Cabrera, a truck driver, drove a load of bundles of irrigation pipe to a facility controlled by Western Ag. & Turf, Inc. ("Western Ag"). Cabrera was working as an independent contractor for D.B. Trucking, owner of the flat-bed truck-trailer on which the pipe bundles were loaded. The pipes were manufactured and loaded onto Cabrera's truck by Pacific Plastics, Inc. ("Pacific Plastics"), at the latter's plant in Brea. After the pipes were loaded, Cabrera secured the load for transport to Western Ag's facility in Fresno. Pacific Plastics had sold the pipes to Western Ag, a regular customer.

Once Cabrera arrived at the Western Ag facility, he unstrapped his load and Western Ag employee Ismael Gonzalez-Paz took charge of unloading the pipes using a forklift. Pacific Plastics did not have any role in unloading the pipes on Western Ag's premises. As Gonzalez-Paz moved the forklift's forks under bundles of pipes at the top

of the stack, one bundle, weighing approximately 1,200 pounds, fell over on the other side of the truck, landing on Cabrera (who had remained in the vicinity of his truck), causing significant injuries.  Cabrera's injuries included a traumatic brain injury, fractures to his cervical spine, lower back, ribs, leg, foot, and a dislocated hip.

Cabrera initiated a personal injury action based on negligence, against named defendants, Western Ag and Ismael Gonzalez-Paz (the forklift operator), as well as several Doe defendants.  The complaint alleged that Gonzalez-Paz negligently unloaded the bundles of irrigation pipes and failed to warn Cabrera before doing so, and that Western Ag negligently hired, trained, and supervised Gonzalez-Paz.  As to the Doe defendants, the complaint alleged they negligently loaded and secured the pipes, resulting in them falling off and striking Cabrera.  Cabrera claimed past and future medical expenses of approximately $1,050, 686, in addition to lost wages of $247,500, plus general damages.

Western Ag filed a cross-complaint for equitable indemnity against Pacific Plastics and D.B. Trucking and its owner.  As to Pacific Plastics, Western Ag alleged that were Western Ag to be found responsible for Cabrera's injuries and damages, Pacific Plastics would owe equitable indemnity to Western Ag.  Thereafter, Cabrera amended his complaint to add Pacific Plastics as a direct defendant, and Pacific Plastics cross-complained against Western Ag for equitable indemnity.

Cabrera, Western Ag, and Pacific Plastics attended a mediation conference before a retired superior court judge, Howard Broadman.  Following mediation, discovery, and some expert discovery, Cabrera settled with both Western Ag and Pacific Plastics for a total of $3 million, with Western Ag settling for $2.9 million and Pacific Plastics settling for $100,000.  Both Western Ag and Pacific Plastics moved in the trial court for determinations, under Code of Civil Procedure section 877.6,[1] that their respective

---

[1]     Subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

3

settlements were entered in good faith, as to prevent claims for comparative contribution or indemnity from the other party. Pacific Plastics did not oppose Western Ag's motion for good faith determination and the trial court granted the motion (that determination is not at issue in this appeal and is final). Western Ag opposed Pacific Plastics' motion for good faith determination, but the trial court ruled the settlement between Cabrera and Pacific Plastics was made in good faith.

Western Ag thereafter filed a petition for writ of mandate in this court, challenging the trial court's ruling that Pacific Plastics' settlement was made in good faith. Western Ag's writ petition was denied. The trial court subsequently dismissed Western Ag's cross-complaint against Pacific Plastics (based on the parties' stipulation to this effect) and entered judgment in the matter. Western Ag appealed the trial court's good faith settlement order and the judgment entered on its cross-complaint against Pacific Plastics for indemnity. The two appeals were consolidated.

## DISCUSSION

I. **The Trial Court's Determination that the $100,000 Settlement Between Cabrera and Pacific Plastics was Made in Good Faith for Purposes of Section 877.6**

Western Ag, the appellant in this matter, argues the trial court committed reversible error in granting Pacific Plastics' motion for good-faith settlement determination and entering judgment on Western Ag's cross-complaint for indemnity from Pacific Plastics. Specifically, Western Ag alleges the trial court should have denied Pacific Plastics' motion for a good faith settlement determination because (1) the deposition testimony of Jandro Parducho, Pacific Plastics' chief operating officer (COO), suggested the bundle of pipes that fell on Cabrera was improperly secured or bundled in the first instance, in that it was tied with steel cables when it should have been secured by square-shaped wooden brackets or racks; and (2) the trial court did not properly assess the import of expert declarations submitted by both parties. We reject Western Ag's

4

contention that the trial court erred in granting Pacific Plastics' motion for a good faith settlement determination and affirm the trial court's order.

### A. Applicable Law

The California Legislature has recognized "that a defendant is unlikely to settle with a plaintiff if the settlement will not end the defendant's involvement in the litigation and will leave it vulnerable to further liability to other defendants." (*Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1018-1019 (*Bay Development*).) "Accordingly, the Legislature has provided that if a trial court determines a settlement was made in 'good faith,' a settling defendant is relieved of any further liability to the nonsettling defendants for equitable indemnity." (*Ibid*.; *Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 817 ["a tort defendant who has entered into a good faith settlement [with the tort plaintiff(s)] … is absolved of any further liability for all equitable indemnity claims"].) "Under this general framework, the trial court's good faith determination plays a key role in harmonizing the objective of encouraging settlement with the objective of promoting a fair apportionment of loss among multiple tortfeasors." (*Bay Development*, *supra*, at p. 1019, citing *Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 873; *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 494 (*Tech-Bilt*).)

The statutes that govern good faith settlement determinations are sections 877 and 877.6. Section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort … it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater[; and] [¶] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties."

5

Section 877.6 states, in relevant part:  "(a)(1) Any party to an action in which it is alleged that two or more parties are joint tortfeasors … shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors….  [¶] … [¶]  (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor … from any further claims against the settling tortfeasor … for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."

*Tech-Bilt* identifies specific, non-exhaustive factors that the court considers in determining whether a settlement was entered into in good faith.  These factors are:  (1)  a rough approximation of the plaintiff's total recovery and the settlor's proportionate liability; (2) the amount paid in settlement; (3) the allocation of settlement proceeds among plaintiffs; (4) the recognition that a settlor should pay less in settlement than he would if he were found liable at trial; (5) the financial conditions and insurance policy limits of settling defendants; and (6) the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.  (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.)  A " 'good faith' " settlement is one that is "within the reasonable range" of the settling tortfeasor's share of liability.  (*Ibid.*)  Furthermore, an apparent disproportionately low settlement does not ipso facto reflect a lack of good faith where the damages are speculative, or liability is highly uncertain or remote.  (*Ibid.* [the settling party's payment of less than its "theoretical proportion or fair share" of the plaintiff's case does not necessarily make the settlement a bad faith settlement].)

One of the most important factors for the trial court to consider in making a good faith settlement determination is the settling party's proportionate liability.  (*Toyota Motor Sales U.S.A. v. Superior Court* (1990) 220 Cal.App.3d 864, 871 (*Toyota Motor Sales*).)  However, the determinant of good faith is not the liability figure that would emerge from a trial.  Rather, "[b]ecause the application of section 877.6 requires an educated guess as to what may occur should the case go to trial, all that can be expected

6

is an estimate, not a definitive conclusion." (*North County Contractor's Assn. v. Touchstone Ins. Services* (1994) 27 Cal.App.4th 1085, 1090 (*North County*).) Thus, ultimately what is required is that "'[a] defendant's settlement figure must not be *grossly* disproportionate to what a reasonable person, *at the time of the settlement*, would estimate the settling defendant's liability to be.'" (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499, italics added; see *North County*, *supra*, at pp. 1090-1091 [a good faith settlement does not call for perfect or even nearly perfect apportionment of liability; all that is necessary is that there be a rough approximation between the settlor's offer of settlement and his proportionate liability].)

"The party asserting the lack of good faith bears the burden of proof. (§ 877.6, subd. (d).)" (*Standard Pacific of San Diego v. A.A. Baxter Corp.* (1986) 176 Cal.App.3d 577, 581; see *Tech-Bilt*, *supra*, 38 Cal.3d at p. 499 [the party asserting the lack of good faith must show that "the settlement is so far 'out of the ballpark' in relation to [the *Tech-Bilt*] factors as to be inconsistent with the equitable objectives of [§ 877.6]"].)

A trial court's determination under section 877.6, subdivision (c) regarding whether a settlement was made in "good faith" is reviewed for an abuse of discretion. (*Norco Delivery Service, Inc. v. Owens-Corning Fiberglas, Inc.* (1998) 64 Cal.App.4th 955, 962 (*Norco*) ["Trial courts enjoy broad discretion in determining whether a settlement was entered in good faith and within the *Tech-Bilt* ballpark, and in allocating potential liability and exposure between or among joint tortfeasors."]; *North County*, *supra*, 27 Cal.App.4th at p. 1095 ["The trial court has wide discretion in deciding whether a settlement is in good faith and in arriving at an allocation of valuation of the various interests involved."].) "'[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking."'" (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 870.) " '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.' " (*Ibid.*)

7

More specifically, "[t]he good or bad faith of a settlement is a question of fact to be determined by the trial court based on the evidentiary material presented to it." (*Barth-Wittmore Ins. v. H.R. Murphy Enterprises, Inc*. (1985) 169 Cal.App.3d 124, 131.) Accordingly, "[a reviewing] court's primary function in [a good faith settlement] appeal is simply to assess whether the [trial court's] good faith determination is buttressed by any substantial evidence." (*Norco*, *supra*, 64 Cal.App.4th at p. 962; see *Toyota Motor Sales*, *supra*, 220 Cal.App.3d at pp. 870-871 [the court's exercise of discretion in making a determination as to "good faith" under section 877.6, " 'involves the resolution of a factual issue which, consistent with time-honored rules of appellate review, must be upheld if supported by substantial evidence' "].) If "there is no substantial evidence to support a critical assumption as to the nature and extent of a settling defendant's liability, then a determination of good faith based upon such assumption is an abuse of discretion." (*Toyota Motor Sales*, *supra*, at p. 871 [substantial evidence is "evidence which is of ponderable legal significance," that is, evidence that is " 'reasonable in nature, credible, and of solid value' "].) "Where conflicting inferences may reasonably be drawn, the determination of the trial court will be accepted on appeal even though a contrary determination would likewise be upheld." (*Id*. at p. 872.)

Section 877.6, subdivision (b), provides that "the issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing." (See *Tech-Bilt*, *supra*, 38 Cal.3d at p. 500 ["Section 877.6 contemplates that the determination of good faith may be made by the court on the basis of affidavits (subd. (b))."].)

### B.  Review of the Trial Court's Good Faith Determination as to Pacific Plastics' Settlement with Plaintiff Cabrera

In the papers presented to the trial court, and on appeal, Western Ag and Pacific Plastics have focused on the primary *Tech-Bilt* factor, that is, their proportionate liability.

Western Ag contends "the overall $3 million settlement is reasonable," as "plaintiff was seriously injured" and "his medical bills alone exceed $1.25 million." Western Ag posits that the question is whether Pacific Plastics' settlement represents a rough approximation of its potential liability, such that Pacific Plastics is justified in precluding Western Ag from seeking equitable indemnity. (See *Long Beach Memorial Medical Center v. Superior Court* (2009) 172 Cal.App.4th 865, 875 (*Long Beach Memorial*) ["the settlor's potential liability for indemnity to the other alleged tortfeasors" is "'an important consideration for the trial court in determining whether to approve a settlement'"].) We conclude the trial court's good faith determination was amply supported by evidence in the record and detect no abuse of discretion in its ruling.

### 1. The Parties' Submissions to the Trial Court

On January 9, 2019, all parties appearing in the action, including Western Ag and Ismael Gonzalez-Paz, as well as Pacific Plastics, reached settlements directly with plaintiff, for a total amount of $3 million, without admitting fault.[2] Western Ag agreed to pay $2.9 million, and plaintiff accepted Pacific Plastics pre-existing section 998 offer of $100,000, an offer that was made with the expectation the matter would proceed to trial and of which Western Ag was aware. In exchange, the plaintiff agreed to provide a general release of all claims against all defendants and a dismissal with prejudice of the complaint, with each party to bear its own costs and fees. Thereafter, Western Ag and Pacific Plastics filed separate motions for good faith settlement, both of which were approved by the trial court. As mentioned, only the court's determination as to Pacific Plastics' settlement is at issue here.

Pacific Plastics filed a noticed motion for a good faith settlement determination on January 25, 2019.[3] The motion was accompanied by declarations from two employees of

---

[2]   Trial was set for January 21, 2019. Depositions of the plaintiff's experts were completed on January 8, 2019. Other expert depositions had been scheduled.

[3]   Pacific Plastics had earlier filed an ex parte application for a good faith settlement determination; the ex parte application was denied by the trial court. Western Ag's

Pacific Plastics, a declaration from an expert, a declaration from Pacific Plastics' attorney, a declaration from the plaintiff's attorney, photographs of the scene of the incident, and a copy of Western Ag's "Loading, Unloading & Using Forklifts" policy. Western Ag filed an opposition to Pacific Plastics' motion for good faith settlement determination. Western Ag's opposition was accompanied by a declaration from Western Ag's attorney, declarations from two experts, photographs of the scene of the incident, documents regarding Pacific Plastics' insurance coverage, the transcript of the deposition of Pacific Plastics' COO, and interrogatory responses provided by the plaintiff, among other evidence. We will summarize below the relevant evidence submitted by the parties in support of their positions.

### (a)     *Photographs of the Scene of Incident*

Both parties included photographs of the scene of the incident with the papers filed in the trial court. The photographs show a flat-bed truck-trailer stacked with bundles of pipes. The bundles are of at least two sizes of pipes (pipes with a smaller diameter and pipes with a larger diameter). The smaller-diameter pipes are bundled or tied together with squared wooden brackets that surround the bundle at intervals along its length. The larger-diameter pipes are bundled or tied together with cables at intervals, with the cables woven around individual pipes as well as the bundle as a whole. The photographs show a forklift with its forks under a couple of pipe bundles at the top of the stack. A bundle of larger-diameter pipes is lying on the ground, on the other side of the truck from the forklift's position. The bundle on the ground is intact, with the pipes still in place and tied together with cables.

### (b)     *Transcript of Deposition of Jandro Parducho*

Western Ag submitted the transcript of the deposition of Jandro Parducho, chief operating officer and chief financial officer of Pacific Plastics, the person most

---

motion for good faith settlement determination was granted by the trial court on January 17, 2019.

knowledgeable about Pacific Plastics' operations and practices. Parducho was responsible for overseeing the production of PVC pipe at the firm's plant in Brea. Based on photographs of the scene of the incident, Parducho noted there was nothing unusual about the load of pipe bundles on Cabrera's truck, on the day in question. Parducho explained that since the pipes were unloaded at the customer's site, Pacific Plastics had no influence on the manner in which the unloading occurred. Parducho said: "I'm not aware of any standard of *unloading* as we only load the PVC pipe." (Italics added.) Pacific Plastics has safety policies in place regarding loading of pipes at its plant. When pipes are loaded onto any truck at Pacific Plastics' premises using a forklift, company policy prohibits anyone from being in the vicinity of the truck other than the forklift operator, for safety reasons; the forklift operator is responsible for ensuring that the area is cleared during loading. Once the pipes are loaded, the truck driver is responsible for strapping down and securing the load. Parducho clarified that the load on Cabrera's truck included bundles of pipes designated for Western Ag in Fresno as well as bundles of pipe designated for another customer in Mettler, south of Bakersfield.

Parducho explained that Pacific Plastics utilized standard procedures in bundling or packaging PVC pipes for transport. The pipes are bundled using a "crate," which is "actually really *a strapping* that bundles together the pieces of pipe." (Italics added.) Parducho also later said that pipes were bundled or crated using rectangular wood brackets, that is, "four pieces of wood" that went around the bundle in a rectangular shape; depending on the dimensions of the pipe in the load, two or three such brackets or "pieces of crate" would be used. The pipes in the load that was sent to Western Ag would have required "three pieces of crate" on each bundle. With reference to photographs of the incident scene, Parducho indicated that the smaller-diameter pipes loaded on Cabrera's truck were encased in square-shaped, wooden crating, while the bundle of pipes that had fallen to the ground on the far side of the truck was bound with "steel strapping"; the fallen bundle—which had crushed Cabrera—was intact, with the

11

strapping still in place.  Parducho said the purpose of the crating was to "secure the bundle."  Parducho appeared to use the term "crating" to refer to both the wooden brackets and the steel strapping used to bind the pipe bundles.  Indeed, Parducho noted the words "crates" and "bundles" were used interchangeably.[4]

### (c)    Declaration of Jandro Parducho

Given that Parducho's deposition testimony regarding the standard methods of crating or securing the bundles was somewhat ambiguous, Parducho clarified the issue in a declaration submitted with Pacific Plastics' motion for good faith settlement determination.  In the declaration, Parducho noted:  "Pacific Plastics has bundled, loaded and shipped irrigation piping like that in question … since 1979, and has done it in the same manner for that entire span."  He also confirmed, with regard to shipments sent to Western Ag specifically:  "From 2016 to the present, including the months and year since the Plaintiff's injuries, [Pacific Plastics] has sold Western Ag & Turf approximately $2,535,088.51 worth of irrigation piping bundled in an identical manner as the bundled load that Defendant Gonzalez[-Paz] knocked onto Plaintiff."  He added:  "The 10" diameter piping that Western Ag's employee knocked onto Plaintiff, is always bundled in the same manner, both individually tied and interwoven together, [and] is as stable if not more stable than the 'full rack' configuration used on other sizes of irrigation piping."  Finally, Parducho noted:  "All shipments of 10" diameter piping is bundled in this same way, including hundreds of shipments to Western Ag and thousands to other customers,

---

[4]    During Parducho's deposition, Western Ag's attorney asked him:  "Pacific Plastics, they attempt to secure the load with crates; is that correct?"  Parducho answered:  "They load the pipe in – yes.  They're called crates or bundles."  Another exchange between Parducho and Western Ag's attorney is illuminating.  The attorney asked whether Pacific Plastics followed "any kind of standard" with regard to bundling the pipes.  Parducho answered:  "Yes, we do have a standard of how we bind the PVC pipe only."  Asked to explain further, Parducho answered:  "Basically based on the dimensions of the pipe.  We'll call it, for sake of reference, the crate, or it's actually really a strapping that bundles together the pieces of pipe packaged together."

without complaint or incident, both prior to the date of Plaintiff's injury and subsequently, to this very day."

### (d) Declaration of Pacific Plastics' Employee Juan Aguilar

Pacific Plastics also submitted the declaration of another employee, Juan Aguilar, with its motion papers. Aguilar had worked for the company since 1980 and been its production manager since 1987. Aguilar's declaration restated and confirmed the points made in Parducho's declaration.

### (e) Western Ag's Policy re: "Loading, Unloading & Using Forklifts"

Pacific Plastics submitted, to the trial court, documentary proof of Western Ag's policy or training material on "Loading, Unloading & Using Forklifts," which notes that "[f]atalities and serious injures while loading and unloading trucks are preventable by following procedures and the proper use of equipment." The document warns: "Material and equipment can shift or break free during any location transfer." The documents states, "[w]hile there is some risk of injury while securing the load, a load that shifts is far more dangerous when it comes to unload," and specifically warns that extra caution is required when "handling structural steel or pipe." The document specifies: "Workers should never be on the opposite side of a truck from a forklift while it is loading or unloading material." It instructs: "Do not allow workers on foot while a forklift is involved in loading/unloading operations." It further instructs: "Provide drivers a place to wait away from the truck." In addition, it warns: "Watch out for bystanders and be sure everyone is outside the 'fall-shadow' of the load." Finally, the document notes: "Forklift operators are responsible for the safety of all ground personnel at the site as well as themselves." Western Ag's policy for "Loading, Unloading & Using Forklifts" was signed by Ismael Gonzalez-Paz, Western Ag's forklift driver, who was unloading the pipe bundles from Cabrera's truck when one bundle fell off and injured Cabrera.

13

### (f) *Declaration of Pacific Plastics' Expert, Peter Petrovsky*

Pacific Plastics also submitted, with its motion papers, a declaration from Peter Petrovsky, "a registered professional engineer-mechanical and civil" since the early 1980s, with "significant experience in matters relating to trucking, forklift operation, as well as the transporting and loading/unloading of piping of all types and sizes." Petrovsky stated in his declaration, with reference to photographs of the scene of the incident: "Those photographs show that the bundle of piping that fell and struck Plaintiff, remained bundled together after traveling from Brea, California, to Central California, and after falling approximately 15-20 feet onto Plaintiff. This indicates to me that the bundle of piping that struck Plaintiff was secure and stable and did not contribute to the piping falling onto Plaintiff." Petrovsky also noted: "The same photographic evidence shows that the forklift being used by Defendant Gonzalez[-Paz] had slid its forks under one bundle without regard for the positioning of the other bundles, thereby causing the incident directly. The photographs further evidence that the forklift operator pushed the bundle he was unloading against the bundle of the 10-inch pipe which was directly contiguous to the bundle of pipe he was unloading. Thus, the forklift caused the bundle of the 10-inch pipe to fall off the trailer and [injure] plaintiff."

Petrovsky further observed: "The 10" diameter piping that Western Ag's employee knocked onto Plaintiff, is always bundled in the same manner, both individually tied and interwoven together, [and] is as stable if not more stable than the 'full rack' configuration used on other sizes of irrigation piping." Finally, Petrovsky noted: "The very fact that Plaintiff was in the vicinity of the trailer when Gonzalez[-Paz] began unloading the irrigation piping was both a per se violation of Western Ag's own forklift policy, policies promulgated by Plastic Pipe Association and OSHA. It is negligent from a reasonable person standard."

14

### (g)    Declaration of Western Ag's Expert, Larry Miller

Western Ag submitted, with its opposition, declarations from two experts of its own, Larry Miller and Russell Darnell. Miller, who specializes in "trucking accident investigation and analysis," noted that Gonzalez-Paz, Western Ag's forklift operator, stated in his deposition that Cabrera was standing at the rear of the trailer before Gonzalez-Paz began unloading the pipes from Cabrera's truck, whereby he had "visually clear[ed] the unloading zone." Miller opined that Cabrera was responsible for "moving into the danger zone" and "for not verbally announcing to [Gonzalez-Paz] that he was going to do so." Miller stated that some of the pipe bundles in the shipment at issue were secured by "banding," which would suggest that when Carbrera strapped down the shipment, the "banded" bundles "would shift and form to the four sided crates that were under and beside them." Miller posited that when the shipment straps were removed by Cabrera, the pipes would be "an unstable group sitting there," that came down "as soon as [Gonzalez-Paz] started to remove the crate of pipes beside the bundle that fell." Miller observed that Jandro Parducho, the COO of Pacific Plastics, "stated that the bundle of pipes of that fell should have had three sides of plywood in order to meet company policy for transport," whereby Pacific Plastics had "failed to comply with their own policy." However, as set forth above, Parducho's deposition testimony suggested that Pacific Plastics used both steel strapping and wooden brackets to secure bundles of pipes, and he later clarified in this declaration that Pacific Plastics always secured bundles of 10-inch diameter pipes (the bundle that fell was a bundle of 10-inch pipes) with steel strapping.

### (h)    Declaration of Western Ag's Expert, Russell Darnell

Western Ag also submitted a declaration from another expert, Russell Darnell, a "safety engineer" and "international consultant." Echoing the false premise of Miller's declaration on the same point, Darnell stated that, according to the deposition testimony of Pacific Plastics' COO, Jandro Parducho, Pacific Plastics "violated their own procedures and standards," because the pipe bundle in question was not secured with

15

wooden crating that would have made it a "'square load,'" but, rather, was merely "banded." Darnell added that "because the pipes were tied in a more rounded shape, they were able to roll off when bumped by the fork lift operator," whereas a "'square'" load would have stayed in place.

On a different note, Darnell observed that the evidence showed that when Cabrera was hit by the falling bundle of pipe, he was "walking alongside the truck trailer directly in the path of the falling load (which he had just unstrapped)." Darnell noted, "Had [Cabrera] been 'at the back of the truck,' i.e., where the license plate is, he would have not been injured even if the entire rear load fell off the trailer." Darnell suggested: "[Cabrera] was most likely 'in a hurry' to get the job done and move onto his next stop. [Cabrera] had already begun to roll up his straps in neat bundles before … the forklift operator, even began to move. It is highly likely that [Cabrera] went from the back of the trailer around to the right side of the trailer to retrieve 'one more strap.' [Cabrera's] movement into the danger zone, without communicating to [Gonzalez-Paz], was a substantial cause of this accident."

### 2. The Trial Court's Ruling

As mentioned, the trial court granted Pacific Plastics' motion for a good faith settlement determination. The court correctly set forth the *Tech-Bilt* factors and applied the *Tech-Bilt* analysis. In line with the focus of the parties' arguments, the trial court primarily addressed whether Pacific Plastics' settlement amount was justifiable in light of its proportionate liability for Cabrera's injuries and the resulting damages.

The court issued a written ruling, stating, in relevant part:

> "Here, Western Ag contests the validity of the settlement. So, it is their burden to demonstrate a lack of good faith. In an attempt to do so, Western Ag submits declarations from its experts, Larry Miller and Russell [Darnell]. Mr. Miller opines that because Pacific Plastics did not crate the pipes according to company standards, they fell when bumped by the forklift driver. Mr. [Darnell] also opines that because Pacific Plastics did not crate the pipes, they fell when bumped. Mr. [Darnell] adds that the round shape of the banded bundle caused them to roll – as opposed to a

16

'square load' which would have resulted had the pipes been transported in crates. Mr. [Darnell] further opines that Pacific Plastics 'violated globally-accepted standards of loading by putting the load destined for another customer on top of the load which Western Ag & Turf, Inc. had purchased'—so that Western Ag had to unload the pipes for the other customer before it could unload the pipes for Western Ag's job.

"In opposition, Pacific Plastic[s] submits a declaration from its own expert, Peter Petrovsky. Western Ag objects to his declaration based upon foundation. However, he is qualified to render his opinion here—Mr. Petrovsky is a registered professional engineer with over thirty years of experience. Mr. Petrovsky opines that the way in which the pipes were banded together is as stable, if not more stable, than the 'full rack' configuration. He also opines that the reason why the pipes fell was because the forklift driver was negligent—he slid the forks under one bundle without regard for the positioning of the other bundles.

"Western Ag's evidence is too speculative to show liability. Mr. Miller and Mr. [Darnell] opine that the pipes fell because they were not properly crated. But there is no industry standard on this point, so what exactly is considered 'proper' is unknown. And in stark contrast to Mr. Miller and Mr. [Darnell], Mr. Petrovsky opines that the bundles were stable. In addition, it is undisputed that the pipes were bumped by the forklift driver. However, Mr. Miller and Mr. [Darnell] neglect to discuss whether he properly unloaded the pipes. And according to Mr. Petrovsky, the forklift driver was negligent in the way in which he unloaded the pipes—he did not merely bump the bundle that fell, as Mr. Miller and Mr. [Darnell] imply.

"Also, there is no evidence that the configuration of the pipes caused them to fall—despite the fact that the way in which the pipes were stacked may have technically violated industry standards.

"Accordingly, defendant Pacific Plastics' application for a determination of good faith is granted."

## 3. Analysis

Here, the court carefully evaluated the evidence provided by the parties and made reasonable inferences from it, within the framework of the *Tech-Bilt* factors. The total amount of the plaintiff's potential recovery at trial was not in question, since all parties appearing in the action had settled directly with the plaintiff on January 9, 2019, in a global settlement worth $3 million, an amount that Western Ag acknowledges is

17

"reasonable" in light of the plaintiff's claims and damages. Next, we presume the trial court "recogni[zed] that a settlor [i.e., Pacific Plastics] should pay less in settlement than [it] would if [it] were found liable after a trial"; this factor supports, rather than detracts from, the trial court's good faith settlement determination. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) As for Pacific Plastics' financial condition and insurance policy limits, because the trial court concluded $100,000 was a reasonable, good faith settlement amount without "discounting" that amount based on any purported financial insolvency or insurance limitations, this *Tech-Bilt* factor was irrelevant to the court's determination. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 969 (*Cahill*); *Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) As Cabrera was the only plaintiff, the factor regarding "the allocation of settlement proceeds among plaintiffs" does not apply. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.)

In addition, there was no evidence of "the existence of collusion, fraud, or tortious conduct aimed to injure the interests of [Western Ag]." (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) Both Western Ag and Pacific Plastics settled with Cabrera on January 9, 2019, after participating in a mediation process involving all the parties appearing in the action (the mediation occurred on November 15, 2018, and the mediator continued to work with the parties in the weeks that followed). Following the mediation, Pacific Plastics made a section 998 offer in the amount of $100,000 to the plaintiff, which offer was served on all parties. Therefore, at the time the settlements were reached, Western Ag was aware of Pacific Plastics' section 998 offer to plaintiff in the amount of $100,000 (which was the offer Cabrera ultimately accepted). Western Ag did not adduce any evidence showing that the January 9, 2019 settlement was intended to injure its interests.

The *Tech-Bilt* factor that was the focus of both the parties' arguments and the court's analysis, was Pacific Plastics' proportionate liability. The court weighed the evidence of the defendants' relative liability. Its ruling reflects it concluded that Western Ag was primarily responsible for causing the bundle of pipes to fall on Cabrera, while the

18

proportionate liability of Pacific Plastics was marginal, remote and speculative. The court reasonably could arrive at this conclusion based on the evidentiary record, in particular the declarations of Pacific Plastics' COO, Parducho, and its expert, Petrovsky. Significantly, the declarations of Western Ag's experts were premised, in important respects, on a flawed interpretation of Parducho's deposition testimony, without regard to the clarification of that testimony reflected in Parducho's subsequent declaration, which vitiated their value. Furthermore, as the court noted, Western Ag's experts did not address the manner in which the forklift operator was moving the bundles, as reflected in the photographs. The declarations of Western Ag's experts, moreover, indicated the plaintiff was at fault for walking on the far side of the truck relative to the forklift's position during unloading, but, at the same time, failed to address that company's own safety policies regarding the unloading of complex loads, with forklifts, at its facility.

Indeed, Western Ag's own policy regarding forklift operation, especially in the context of unloading of massive bundles of pipes, lends support to the trial court's conclusion. Had Western Ag simply directed Cabrera to wait in a separate, safe area during the unloading process and properly secured the area in the vicinity of the truck-trailer, as required under its safety policy, the injuries and damages sustained by Cabrera would have been avoided entirely. In short, the trial court's reasoning and ruling indicate the court concluded, as to the relative, potential liability of Western Ag and Pacific Plastics, that the bulk of liability rested with Western Ag, and this conclusion is supported by the record. Stated differently, the trial court could rationally find that, based on the information available at the time of the settlement, a reasonable person could believe Pacific Plastics had little, if any, potential liability for Cabrera's injuries. Furthermore, since the trial court presumably concluded Pacific Plastics' potential liability was remote based on lack of causation, the court could rationally conclude Pacific Plastics had no greater liability to Western Ag for equitable indemnity than it had to Cabrera for negligence. (See *Cahill*, *supra*, 194 Cal.App.4th at p. 965 [where the

19

settling defendant's actions or omissions were not a substantial factor in causing the plaintiff's damages, the settling defendant generally cannot have any liability for equitable indemnity to a nonsettling defendant].)

Western Ag's citation of various cases in which courts concluded the settlement amounts were unreasonably low in comparison to the settling defendant's potential liability does not persuade us the settlement amount in the circumstances of this case was unreasonably low based on the information available in January 2019 (when the settlement was reached). (See, e.g., *Long Beach Memorial*, *supra*, 172 Cal.App.4th 865; *Gehl Brothers Manufacturing Co. v. Superior Court* (1986) 183 Cal.App.3d 178; *TSI Seismic Tenant Space, Inc. v. Superior Court* (2007) 149 Cal.App.4th 159.) Although, in the above-referenced cases cited by Western Ag, settlement amounts representing 2 percent or less of the plaintiffs' total damages were disapproved as unreasonably low in comparison to the settling defendants' proportionate share of the plaintiffs' total damages, those cases are factually inapposite to this case and do not persuade us the trial court in this case could not rationally conclude the $100,000 settlement amount (representing 3 percent of the plaintiff's total recovery of $3 million) was not grossly disproportionate to Pacific Plastics' potential liability (based on the information available at the time of settlement).

Indeed, there are numerous cases in which relatively insubstantial settlement amounts were upheld as made in good faith. (See, e.g., *Bay Development*, *supra*, 50 Cal.3d at p. 1028 [$30,000 settlement amount versus $1 million claimed damages]; *Wysong & Miles Co. v. Western Industrial Movers* (1983) 143 Cal.App.3d 278, 283 [$65,000 settlement amount versus $7 million claimed damages]; *Wilshire Ins. Co. v. Tuff Boy Holding, Inc*. (2001) 86 Cal.App.4th 627, 631-632 [$50,000 settlement amount versus plaintiffs' $1.425 million claimed total case value].) Since each case must be decided based on its particular circumstances, we conclude Western Ag's cited cases do not show the trial court in this case abused its discretion in determining a reasonable

20

person could believe, based on January 2019 information, that the $100,000 settlement amount was within the ballpark of reasonable settlements and was not disproportionate to Pacific Plastics' potential liability in the circumstances of this case. Furthermore, as discussed above, none of the other *Tech-Bilt* factors undercut the trial court's good faith determination. We also reject Western Ag's argument that the trial court applied incorrect legal standards in reaching its conclusions.

Making all presumptions and reasonable inferences in favor of the trial court's order, the trial court could rationally conclude that neither Pacific Plastics nor Cabrera had a goal of injuring Western Ag's interests by entering into the January 9, 2019 settlement. Rather, the court could reasonably conclude Pacific Plastics decided to save potential litigation costs and buy its peace based on its assessment of its proportionate liability, be it remote and speculative. Similarly, based on the record in this case, the trial court could reasonably conclude the $100,000 settlement was not disproportionately low and Pacific Plastics did not enter into it as to improperly obtain immunity from Western Ag. (See *Cahill*, *supra*, 194 Cal.App.4th at p. 969.)

We conclude the trial court did not abuse its discretion in considering the *Tech-Bilt* factors and determining the settlement between Pacific Plastics and Cabrera was made in good faith within the meaning of section 877.6.

## DISPOSITION

The trial court's order granting Pacific Plastics' motion for good faith settlement and the judgment on Western Ag's cross-complaint against Pacific Plastics, for indemnity, are affirmed.

                                                                    SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


SNAUFFER, J.